The Merchants' Bank, of Baltimore, vs. the Bank of Commerce, in New York, use of Hoffman & Company, of New York.

Payment by Mistake : Negligence : Bills of Exchange and Promissory Notes.—H. & Co., of New York, drew a draft on L. & Co., of Baltimore, and sold it to a bank in New York, which sent it to its correspondent, a bank in Baltimore, for collection. By the negligence of the bank in Baltimore, the draft was not collected, and L. & Co., having failed in business, it was protested and returned to the bank in New York, which notified the fact of the dishonor to H. & Co., who, in ignorance of the fact of negligence, paid the amount of the draft. On a suit brought by the bank in New York for the use of H. & Co., against the bank in Baltimore, Held :

1st. That the payment by H. & Co. being made in mistake, conferred no benefit on the plaintiff, and could not operate for the advantage of the defendant, in the way of discharging or suspending its anterior liability to the plaintiff.

2nd. That as the amount of the draft was paid by H. & Co. under a mistake that entitled them to a return of the money, the plaintiff must be regarded as having received it for their use, and as holding it subject to their order. In legal contemplation the payment was a deposit, for which the plaintiff must account, and which, instead of suspending or discharging the defendant from its existing liability to the plaintiff, charges the plaintiff with one of an entirely different character to H. & Co.

3rd. Nor was it essential to the plaintiff's right to recover, that the jury should find that the draft was returned to the defendant. The claim asserted here is not upon the draft, but one sounding in damages for the loss caused by the defendant's negligence and consequent failure to collect it.

Negligence : Evidence : Province of Court and Jury.—In cases where the question of negligence is involved, a Court may, by proper legal inferences from the nature of the undertaking, determine in general the things required to be done in performing it, and the failure to do any of the things so required to be done would amount to negligence; but it has no such power when the question as to due diligence is made to depend on a state of facts and circumstances of a character so unusual that they could not have been contemplated by the parties to the undertaking, and to which no settled rule of law can be applied.

Construction of the Words "Doubtful Credit": Trial of Facts.—The words "Doubtful Credit" are very comprehensive, and when used without words of limitation or qualification, are understood to mean reputation or standing in the community, as distinguished from the estimate of particular individuals ; and in that sense the doubtful credit of a party, when found, is a fact of which persons presumptively have knowledge, without other proof of knowledge.

APPEAL from the Superior Court of Baltimore City.

This is an action, instituted by the appellee against the appellant, to recover damages resulting from the neglect to use due and proper diligence to collect a draft for $3,000, drawn by Hoffman & Co., on Josiah Lee & Co., bearing date the 29th of October, 1860, which the appellant had undertaken to collect for the appellee. Errors in pleading on both sides were waived, and it was agreed that the plaintiff or defendant might respectively rely on any claim or defence to which the facts of the case might entitle them.

*Exception.*—At the trial of the cause, it was admitted in writing that Hoffman & Co. sold to the appellee, their *sight draft* on Lee & Co , being the one described in the declaration, and that the appellee remitted it for collection to the appellant, its correspondent in Baltimore; that on the 30th of October, the runner of the appellant presented the draft to Lee & Co., about one o'clock, P. M., and a check on the Mechanics' Bank, for the amount, was given by Lee & Co. to the runner, who thereupon delivered to them the draft ; that although the Mechanics' Bank was in the same square with the Banking House of Josiah Lee & Co., the runner, instead of taking the check to the Mechanics' Bank to have it cashed or endorsed " good," returned with it to the Merchants' Bank ; after the draft was presented to Lee & Co., as aforesaid, and on the same day, they stopped payment ; that after the check was received by the runner, and taken to his bank, the president of the appellant, hearing that Lee & Co. were about to fail, and that the appellant held their said check, directed their runner to present it to the Mechanics' Bank for payment, which was immediately done, and payment refused, whereupon application was made by the runner to Lee & Co., but they also refused, but subsequently returned the draft, and received back their check ; that the draft was thereupon protested and returned to the appellee, who demanded and

14 MARYLAND REPORTS.

Merchants' Bank of Baltimore *vs.* Bank of Commerce use of Hoffman.

received payment of it from Messrs. Hoffman & Co., neither the appellee nor Hoffman & Co. knowing anything of the above-mentioned facts, except that the draft had come back protested ; that Hoffman & Co. were entitled to draw said draft, and Lee & Co. were bound to pay it on presentation ; that on learning the facts, Hoffman & Co. wrote to the appellee, asking permission to institute the present action in its name, for the purpose of testing the liability of the appellant, enclosing a letter from their counsel, in which it was suggested that they might not be able to maintain a suit in their own name, because there was no privity of contract between them and the appellant; that the appellee enclosed this letter to the appellant, and asked whether the latter preferred that the liability of the latter should be tested in that way, or by a suit brought by Hoffman & Co. against the appellee in New York. The appellant, after some delay, replied that it was advised not to pay until its liability was established by our own Courts, and thereupon, the present suit was brought.

*Holtzman,* the appellant's witness and runner, proved, that he presented the draft to Lee & Co. shortly after one o'clock, on the 30th of October, 1860; that they gave him therefor their check on the Mechanics' Bank, and that he surrendered the draft, and after completing his rounds, took the check, without having presented it for payment or endorsement, back to his own bank ; that it was entered on the books of the bank, and $3,000 passed to the credit of the appellee, and the book on which it was so entered handed over to the teller ; that the check reached the teller near three o'clock, and after he had had it from ten to fifteen minutes, the teller told the witness that he had just heard from Mr. Hopkins, the president of the appellant, a rumor that the house might fail, and directed the witness to present it to the Mechanics' Bank.

The witness, *Holtzman,* took the check to the Mechanics'

Bank, where he arrived with it about three o'clock. The teller held the check in his hand for some time, to see if it would be made good by a deposit, and while doing so, was directed by the cashier not to pay it. Holtzman then applied to Lee & Co., who said they had no money to pay it, and refused at first to return the draft—their confidential clerk saying it had been cancelled and charged up : they were eventually persuaded by the assistant cashier of the appellant to surrender it, and it was protested.

*Rogers*, the teller of the Mechanics' Bank, and *Coleman*, the cashier, both prove that the check would have been paid or endorsed "good," at the pleasure of the holder, at any time before two o'clock, and as late as nearly three of that day, and *Coleman* proved that four checks *drawn after the one in question*, amounting to $13,284.75, were, in fact, either paid or endorsed "good ;" that this was the first of which payment was refused, and that said bank paid or endorsed "good" that day the checks of J. Lee & Co., to the amount of $130,000.

*Coleman*, also proved on cross-examination, that, on the morning of the 30th of October, 1860, the money market being stringent—people everywhere losing confidence in each other, and Josiah Lee & Co. having over-checked, and the bank holding then some $26,000 of their unredeemed checks, which, under the custom of the bank, as between it and those who had deposited such checks, he had a right to return before 11 o'clock, he became uneasy, and went down to their banking house to notify them that unless they made good their account by a deposit, he would return said checks ; that their confidential clerk begged him not to do so, and said that "they had money in the house, and could make a deposit in a few minutes ; that one of the firm had just gone out with Messrs. Johns Hopkins, (the president of the appellant,) and John Garrett, and that he thought they would get money ;" the

HARVARD LAW SCHOOL LIBRARY

fears of the witness were then allayed ; that the promised deposits, and some six or seven others being made during the day, amounting to $57,214$\frac{80}{100}$, the bank continued to pay their checks till near three o'clock ; that he then became apprehensive, because the checks came in faster than in the morning, and the deposits were not so large as they should have been, and *there seemed to be an uneasiness felt about the house in the community*, and when the check held by the appellant was presented, he told the teller not to pay it. The witness also proved on cross-examination, that Lee & Co. were in fair credit up to the time of their failure ; that some time before, having occasion to make inquiries as to their standing, he ascertained them to be in fair credit and standing, and that they were considered an exceedingly honorable house ; that they did probably as large a business in their line as any house in town ; that their transactions were of such magnitude as to excite the surprise of the bank, as they sometimes made deposits to the amount of $200,-000 in one day ; and that their failure excited great surprise, not only in the community, but all over the country ; that they had some considerable credit with his bank on the 30th Oct., as is shown by the transactions between them ; and when they failed they were in debt to the bank in the sum of $48,140, for which the bank held collaterals ; and that the witness would not consider a runner indiscreet who on that day would have taken their unendorsed check for $5,000.

The same witness also proved that he has been a bank runner and is familiar with the practice of banks with reference to sight drafts, and that his practice is always to take a check, and, unless the honor of the house is doubted, to give up the draft, but if there is any doubt about the check, to get it endorsed ; that if convenient, or there is any doubt about the check, then the check is presented at once for endorsement ; that if a merchant takes time to consider

whether or not he will pay a draft drawn, the practice is to give him till three o'clock, or after, before protesting; and if a check were taken for a sight draft brought into the bank, and afterwards presented and dishonored, it appeared to witness (although this was the first case of the kind that he remembered,) that the natural and proper course would certainly be to return the check and get back the draft for protest.

The plaintiff then further proved by *Mr. Krebs,* that he is specie clerk to the clearing house, and now acting as runner of the Union Bank, during the sickness of the regular runner ; that the practice among banks is to present a sight draft to the drawer, and upon receiving a check for it, to go at once to the bank on which it is drawn and have it endorsed ; that he always had Lee & Co.'s check endorsed at once,—that they were not tip-top ; that he did not himself know their condition on the 30th October, 1860, but considered them weak, and heard talk in the community about their weakness about that time ; and that under such circumstances, he would undoubtedly have considered it his duty, under the usage between banks in this city and their correspondents abroad, to present a check received in payment of a draft to be certified as good, at once, before returning to his bank.

On cross-examination the same witness stated that he followed, without regard to the usage the special instructions of his bank, and they were of such a character that if he had a check of any good merchant of undoubted standing, he could return to the bank before presenting it ; that if he had some doubt about a check even, witness would take his rounds, and it was within his power as runner to arrange when he would present it consistently with his duties and convenience during business hours.

The plaintiff then further proved by *James W. Allnutt,* the president of the Bank of Commerce, (of Baltimore) that

the usage among banks in Baltimore as between them and their correspondents is, and was, on the 30th Oct., 1860, to present a sight draft as early in the day as business will permit, and if a check be given in exchange to have it immediately certified before taking it back to the bank, and if this be not done the check is under the usage a payment of the draft ; that his instruction to his runner is always to have a check taken for a draft at once endorsed, before returning to his bank ; that the runner has no discretion, and if he brings in an unendorsed check the responsibility is with the teller and the bank, and as between the latter and its correspondent the draft is considered paid ; that the house of Lee & Co. was in bad credit on the 30th October, 1860, his impression for some weeks before their failure having been that they were in bad credit, and under that impression he gave positive instructions to his teller not to receive their unendorsed checks ; and that from his knowledge of their credit on the 30th October, 1860, and of their credit in the community at that time, he would not have thought it reasonably prudent to have taken their unredeemed check.

On cross-examination the same witness stated that the first business of the runner in the morning is at the clearing house, from which he returns about nine o'clock, when he enters up the drafts for presentation for payment and acceptance, whether on merchants, brokers, or banks, and gets out on his rounds by about ten or eleven o'clock ; that it takes him of course some time, depending on the amount of paper and the route he takes to present his paper ; that the instruction witness gave his teller was verbal and some days before the failure of Lee & Co.; that his general instruction to his runner not to take unendorsed checks, did not make his rule inflexible and he would himself take the responsibility of retaining the check of a good house if it were brought in by the runner ; that the teller at the counter takes checks of good parties on deposit unendorsed be-

cause they could be returned up to eleven o'clock the next day ; but if a check is taken for a bill of exchange or promissory note held by the bank for collection, witness thought the responsibility and risk of the collecting bank was definite at once on such exchange, and the loss would fall upon the collecting bank.

In reply to a question of the plaintiff's counsel, he further stated that in all he had said about the responsibility of collecting banks and their duty and that of their runners, witness expressed not only his individual opinion, but the result of established usage between banks in the city and their correspondents.

The plaintiff then proved by *Patrick Gibson,* cashier of the Bank of Baltimore, that he did not think Lee & Co. had much credit on the 30th October, 1860, and that their credit on that day was neither very good nor very bad, but sufficiently doubtful to prevent loans to them without security, or their checks being taken without endorsement ; that considering their standing, it was the duty of a bank having a sight draft on them to have had the check received therefor immediately endorsed ; and that the usage of banks in this city, as between them and their correspondents abroad, so required.

On cross-examination the same witness stated that the teller had instructions with respect to taking checks of that, and other houses, to get them endorsed ; that in case a check were taken for a sight draft and presented immediately, and dishonored, the course of the bank would be to get back the draft for protest, and he would not consider a bank bound having used due diligence ; that the runner is bound to take the nearest road to the bank, on which the check is drawn, before his return to his own bank, and if when he received the check it was good, and in consequence of going his rounds, it was not paid, it is not due diligence ; that it is the universal practice to take checks for drafts,

and if a check is brought in unendorsed and is sent back by the teller during business hours, the bank would not be bound if the check is dishonored, unless it would have been paid if presented before ; that checks and sight drafts must be presented before three o'clock, and may be at any time before that, if the check of any house however good ; that even if of the house of Alexander Brown & Sons, had been taken for a sight draft brought in unendorsed, and the teller had sent it in between two and three o'clock, and in the meantime that house had by some miracle failed, the loss would fall upon the bank.

The plaintiff then proved by *Mr. Mickle*, cashier of the Union Bank, that the credit of Lee & Co. was not very good on the 30th October, 1860 ; that it was not so undoubted as it had been, and he had given special instructions for some time previous to their failure not to receive their unendorsed check for any purpose ; that it was the duty of a bank having a sight draft on them for collection under the usage of banks in Baltimore, as between them and their correspondents to have had their check endorsed before returning to bank.

On cross-examination he further stated, that the practice is for the runner always to take checks and give up the draft, but to get the checks endorsed, unless they were of small amount, or those of houses in undoubted credit, where checks usually were taken.

The defendant then proved by *Mr. Martin*, the runner of the Mechanics' Bank, that the uniform practice among banks holding sight drafts for collection is to present them at any time before three o'clock, and to surrender the draft before receiving a check ; that if of a doubtful house the check is presented before returning to bank, (and the house of Lee & Co. was such a house on the 30th October, 1860,) but checks of such houses as Johnston & Bros., McKim & Co., Carson & Co., the practice does not require to

be endorsed, but they often go into the lists of the next day; that he would take a check of a doubtful party to have it endorsed in the course of his rounds, but if he had brought it into the bank and afterwards gone out with it for endorsement, and it had been dishonored, he thought the duty of the bank would be to get back the draft, and protest, and if done before three o'clock all its duty would have been performed.

On cross-examination he stated, that he believed, on 30th October, 1860, that Lee & Co. were bad, and consequently would have had their check endorsed, but if presented before three o'clock, his duty would have been performed.

The defendant then proved by *Mr. James*, the runner of the Bank of Baltimore, that it is the practice to take checks for sight drafts, and if of doubtful persons or of very large amount, to have them endorsed good before taking them back to bank, but if the party is supposed to be good, the check is brought in without endorsement; and that if the teller sent him back with a check for endorsement, and it was dishonored; the duty of the bank would be to get back the draft and protest it.

The defendant then proved by *D. A. Jones*, the third teller of the defendant, that the general practice with reference to sight drafts, is to take all drafts out together in the morning, and arranging the runner's route according to the number and situation of the parties to present them in time; that upon receiving checks the universal practice is to give up the draft, and if of a doubtful house, and the bank on which it is drawn is within the route, to get it endorsed, but if not within these rounds to bring it back to the bank, when if objected to, the teller sends out to have it endorsed; that the witness has himself had when runner, eighty-one drafts at one time to present, and it would be impossible to get every check endorsed; that he had no reason to doubt the credit of Lee & Co. on the 30th October, he knew they

were in stocks, but not enough to affect their credit ; that if a check received for a sight draft, were presented before three o'clock and dishonored, and the draft procured again and protested, the collecting bank under the usage would have performed its duty ; that witness would have delayed in such case by performing other work about the bank, and if he presented the check before three o'clock, would have thought it sufficient.

On cross-examination the same witness stated that he had as much opportunity as any person or officer of the bank to know about the solvency of houses ; that the practice does not require presentation of a check, where of a doubtful house, if out of runner's route, before returning to bank. Witness would have taken a check of Lee & Co. drawn on the Mechanics' Bank, back to his own bank if he had thought them good.

The defendant then proved by *Mr. Rogers*, paying teller of the Mechanics' Bank, that this check was presented late in the day, but during banking hours to the best of his knowledge ; that he made no objection about the time, but asked the runner to wait a few minutes for a deposit ; that if the check had been good it would have been endorsed, and was in time for that purpose, if Lee & Co. had funds there ; that he was acquainted with the usage in relation to sight drafts ; that it is customary to receive checks, not to demand cash and to give up the draft, sometimes these are endorsed, sometimes not, according to the standing of the house, and if of a responsible house, they are sent in the next day ; that Lee & Co. were considered a responsible house up to the time of their failure. On cross-examination he also stated, that if this check had been presented before two o'clock, it would have been paid.

The defendant then proved by *Mr. James Mott*, cashier of the Farmers' & Mechanics' Bank, that the practice in relation to sight drafts, is to give them up on receiving a

check, unless the honesty of the party is doubted, and if the person has confidence in the party paying the check, he does not get it endorsed ; that a draft may be left with the party bound to pay it, if requested, the whole day ; and if the check is retained, it is at the risk of the collecting bank, if the money would have been paid on it, and it is lost by not being presented promptly ; that the loss would be our loss, not that of our correspondent.

The defendant then proved by *Mr. Compton*, that he is in the Merchants' Bank, and was formerly runner for a year and a half ; that the universal practice is to take checks for drafts if the parties are known at all, sometimes endorsed, sometimes not, according to the standing of the house, and to take checks of banking houses for almost any amount ; that it is the teller's business to object to them if doubtful, and send them out for endorsement ; that the average number of checks for drafts, when he was runner, was from sixty-five to seventy, and it took him all day to present these drafts ; that the checks of Lee & Co. were taken without endorsement, and sent in the list of next day, and he was very much surprised, when they failed.

On cross-examination, he stated that he spoke of the practice between himself and the teller of his bank, and also thought the usage general among banks and bank runners ; that he had nothing to do with the responsibility of the bank to its correspondents ; if parties requested it the draft might be left till three o'clock for consideration.

The defendant then proved by *Chauncy Brooks*, President of the Western Bank, that the usage in reference to drafts, is to take checks for them, the runner bringing them to the teller, and if good, they are put into the list for next day ; if the teller thinks them suspicious, he sends them out again for endorsement ; that his bank sent in a check of Lee & Co. for $5,000, of 30th Oct. on the next day,

which was returned unpaid ; that he always supposed that Lee & Co. were good ; that they would have had credit with his bank unendorsed for $5,000 on that day ; that a check for that amount would have been taken for a sight draft, without any collaterals ; that he takes no better checks every day, and their failure surprised him and everybody else.

On cross-examination, he stated that the check he spoke of was taken on deposit; that the bank let them have money, and they deposited their check to make the account good ; that the bank had collaterals, but don't know whether they were applicable to that check ; that Lee & Co. would have had credit with his bank through the arrangement made between them, but independent of collaterals, the bank would have taken such a check as cash on deposit, relying on their credit, and that he never suspected their credit.

The testimony being closed, the plaintiff presented the following prayers to the Court :

*Plaintiff's first Prayer.*—The plaintiff by its counsel, prays the Court to instruct the jury, that if they believe the facts stated in the agreed statement, and also from the evidence in the cause, that the plaintiff transmitted to the defendent as its correspondent in Baltimore, for collection, the bill of exchange for $3,000, dated the 29th of October, 1860, which has been offered in evidence, and that the defendant as such correspondent, received and undertook and assumed to collect the same on the morning of the 30th of October, 1860, and placed it in the hands of the witness Holtzman for that purpose, and that said Holtzman was an officer or agent of the defendant, and that said Holtzman presented said bill of exchange, to the said Josiah Lee & Co., about one o'clock in the afternoon of the 30th of Oct., 1860, and that the said Josiah Lee & Co., on whom the same purports to have been drawn were then in doubtful

credit, and that the said Holtzman then received from the said Josiah Lee & Co., for said bill of exchange and other claims, also in the hands of the defendant, the check on the Mechanics' Bank for $5,070.78, which has been offered in evidence, and gave up said bill of exchange to Josiah Lee & Co., and that the latter marked said bill as cancelled, and that the said Mechanics' Bank was at that time within the same square with the banking house of the said Josiah Lee & Co., and that the banking house of the defendant is several squares off from the latter, and that the said check would have been paid by the Mechanics' Bank if it had been presented at any time between one and two o'clock in the said afternoon of the 30th October, 1860, and that said check was taken by the said Holtzman to the defendant, and the amount thereof placed by it to the credit of the plaintiff, and that the payment of said check was not demanded until a few minutes before or after three o'clock in the afternoon of the 30th of October, 1860, then the plaintiff is entitled to recover in this action.

*Plaintiff's second Prayer.*—The plaintiff by its counsel, prays the Court to instruct the Jury, that if they believe the facts stated in the agreed statement, and also from the evidence in the cause, that the plaintiff transmitted to the defendant as its correspondent in Baltimore, for collection, the bill of exchange for $3,000, dated the 29th of October, 1860, which has been offered in evidence, and that the defendant as such correspondent, received and undertook and assumed to collect the same on the morning of the 30th of October, 1860, and placed it in the hands of the witness Holtzman, for that purpose, and that said Holtzman was an officer or agent of the defendant, and that the said Holtzman presented said bill of exchange, to the said Josiah Lee & Co., about one o'clock in the afternoon of the 30th of October, 1860, and that the said Josiah Lee & Co. on whom the same purports to have been drawn, were

then in doubtful credit, and that said Holtzman then received from the said Josiah Lee & Co., for said bill of exchange and other claims, also in the hands of the defendant, the check on the Mechanics' Bank for $5,070.78, which has been offered in evidence, and gave up said bill of exchange to said Josiah Lee & Co., and that the latter marked said bill as cancelled, and that the said Mechanics' Bank was at that time within the same square with the banking house of the said Josiah Lee & Co., and that the banking house of the defendant is several squares off from the latter, and that said check would have been paid by the Mechanics' Bank, if it had been presented at any time between one and two o'clock in the said afternoon of the 30th of October, 1860, and that said check was taken by the said Holtzman to the defendant, and the amount thereof placed by it to the credit of the plaintiff, and that the payment of said check was not demanded until a few minutes before or after three o'clock in the afternoon of the 30th of October, 1860, and that on the said 29th and 30th of October, 1860, there was a uniform usage and custom among the banks of the city of Baltimore, as between such banks and their correspondents abroad, remitting to them drafts for collection, which would make such circumstances, if found to exist as hereinbefore hypothetically stated, amount to a payment of said draft as between the plaintiff and defendant, that then the plaintiff is entitled to recover in this action.

And the defendant presented to the Court the following prayers :

*Defendant's first Prayer.*—The defendant prays the Court to instruct the jury, that if they find the facts contained in the statement of facts, signed by the counsel, and shall further find that it is the established practice with the banks of the city of Baltimore, and was on the 30th of October, 1860, to receive checks from drawers of sight drafts, and

to leave the drafts on the receipt of such checks, then the plaintiff is not entitled to recover in this case.

*Defendant's second Prayer.*—That if the jury find the facts required to be found in the preceding prayer, and further find that up to two o'clock of the day of the failure of Lee & Co., said firm was in such credit with the defendant and its officers, and prudent and careful officers of other banks in the city of Baltimore, that their checks were and had been taken without endorsement, as cash on deposit, and in exchange for sight drafts, and shall further find that the check of said Lee & Co., taken by the runner Holtzman in exchange for the sight draft of Messrs. Hoffman & Co., given in evidence, was presented to the teller of the Mechanics' Bank during the business hours of the 30th of October, 1860, and that when so presented, it was not at once refused payment, but that the runner was told to wait a few minutes, until the teller could ascertain whether the check would be made good by a deposit, and shall further find that previously on said 30th of October, the Mechanics' Bank had paid or endorsed checks of said Lee & Co., to the amount of upwards of $120,000, then the plaintiff is not entitled to recover.

*Defendant's third Prayer.*—The defendant prays the Court to instruct the jury that if they find the facts set forth in the admissions signed by the counsel of the plaintiff and defendant, that then the defendant was the agent of the plaintiff and not of Messrs. Hoffman & Co., to collect the draft of Messrs. Hoffman & Co., offered in evidence, and is responsible to the plaintiff alone, for due diligence in regard to the collection thereof.

*Defendant's fourth Prayer.*—The defendant further prays the Court to instruct the jury, that the plaintiff cannot charge the defendant for a want of due diligence in reference to the collection of the draft mentioned in the preceding prayer, without showing that the plaintiff has suffered

loss from want of such diligence, and if the jury find that on the return to New York of said draft duly protested, the amount thereof was promptly and fully paid by the drawers to the plaintiff, and has never been repaid by the plaintiff to the drawers, and that the plaintiff has never set up any claim against the defendant on its own account, but has presented the claim now sued on, as that of Messrs. Hoffman & Company, as shown by the correspondence given in evidence, and that the plaintiff has never returned said draft of Messrs. Hoffman & Company, to defendant, then the plaintiff is not entitled to recover.

*Defendant's fifth Prayer.*—That if the jury find the facts required to be found in the preceding prayers of the defendant, but shall also find any want of due diligence by the defendant in reference to the collection of said draft, the plaintiff cannot recover more than nominal damages.

*Defendant's sixth Prayer.*—That by the entry of this suit to the use of Messrs. Hoffman & Company, the plaintiff is not entitled to enlarge his damages beyond what the plaintiff would be legally entitled to, if no such entry had been made.

*Defendant's seventh Prayer.*—The defendant further prays the Court to instruct the jury, that if they find the facts required to be found in the preceding prayers of the defendant, and find that the runner of the defendant, at the time he received the check from Messrs. Lee & Company mentioned in the evidence, had no reason to doubt the credit of Messrs. Lee & Company, and supposed that the said Lee & Company were of good credit, and shall further find that the failure of Messrs. Lee & Company, excited great surprise with intelligent bankers and business men in the city of Baltimore, that then the said runner was not bound to present said check to the Mechanics' Bank before returning to the banking house of the defendant; and if they shall find that as soon as practicable under all the cir-

cumstances of the case, after the defendant ascertained the doubtful solvency of Messrs. Lee & Company, the said check of the Messrs. Lee & Company was presented to the Mechanics' Bank, and duly dishonored, the plaintiff is not entitled to recover.

But the Court below, (MARTIN, J.,) rejected all of said prayers, and gave the following instruction to the jury :

I instruct the jury that if they believe the facts stated in the agreed statement, and also from the evidence in the cause that the plaintiff transmitted to the defendant, as its correspondent in Baltimore, for collection the bill of exchange for $3000, dated the 29th of October, 1860, which has been offered in evidence, and that the defendant as such correspondent received and undertook and assumed to collect the same on the morning of the 30th of October, 1860, and placed it in the hands of the witness Holtzman for that purpose, and that said Holtzman was an officer or agent of the defendant, and that said Holtzman presented said bill of exchange to the said Josiah Lee & Company, about one o'clock in the afternoon of the 30th of October, 1860, and that the said Josiah Lee & Company, on whom the same purports to have been drawn, were then in doubtful credit, and that the said Holtzman then received from the said Josiah Lee & Company, for said bill of exchange and other claims also in the hands of the defendant, the check on the Mechanics' Bank for $5,070.78, which had been offered in evidence, and gave up said bill of exchange to Josiah Lee & Company, and that the latter marked said bills as cancelled, and that the said Mechanics' Bank was at that time within the same square with the banking house of the said Josiah Lee & Company, and that the banking house of the defendant is several squares off from the latter, and that the said check would have been paid by the Mechanics' Bank, if it had been presented any time between one and two o'clock in the said afternoon of the 30th of October,

1860, and that said check was taken by the said Holtzman to the defendant, and the amount thereof placed by it to the credit of the plaintiff, and that the payment of said check was not demanded until a few minutes before or after three o'clock in the afternoon of the 30th of October, 1860, and if they shall also believe that at the time last mentioned there was a usage among the banks of the city of Baltimore, as between them and their correspondents abroad, to get checks received for sight bills of exchange, when said checks were drawn by houses or individuals of doubtful credit, paid or endorsed good before taking them back to the banks holding them for collection, then the plaintiff is entitled to recover in this action the amount of said bill of exchange ; *provided* the jury find that the defendants in failing to have the said check presented for payment or to be endorsed as good by the Mechanics' Bank before three o'clock on the 30th of October, 1860, were guilty of a want of due care, skill and diligence in their employment as collectors of the said bill of exchange ; and that they also find that the said check if it had been presented for payment between the hours of one and two o'clock on that day, would have been paid by the Mechanics' Bank, and the said draft collected.   To the rejection of which said prayers offered by the defendant, and each of them, and to the granting of said instruction as given, the defendant excepted, and the verdict of the jury and judgment being for the plaintiff, appealed.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, COCHRAN and WEISEL, J.

*F. W. Brune* and *C. J. M. Gwynn* for the appellant.

A check upon a bank, given in the ordinary course of business, is not presumed to be received as an absolute payment, even if the drawer have funds, sufficient to meet

the check, in the bank on which it is drawn. It is looked upon as the means by which the holder may procure the money. *Cromwell vs. Williams & Lovett*, 1 *Hall*, 56. *Olcott vs. Rathbone*, 5 *Wend.*, 491. *Everett vs. Collins*, 2 *Camp.*, 515. *Russell vs. Hankey*, 6 *T. R.*, 13. To constitute such a check a payment, there must be evidence in the Record that it was *expressly* received in substitution for, and in satisfaction of, the bill in reference to which it was given. *Clopper's Admr. vs. Union Bank*, 7 *H. & J.*, 100. *Glenn vs. Smith*, 2 *G. & J.*, 509. *Crawford vs. Berry*, 6 *G. & J.*, 71 and 72. And the law upon which we have insisted is yet more expressly decided in the case of the *Md. and N. Y. Coal and Iron Co. vs. Wingert*, 8 *Gill*, 177.

It would be absurd to suppose that the law would imply that a check, which is, while unpaid or unaccepted, only the *evidence* of the indebtedness of its drawer, was accepted as a payment of a bill, which was itself not only an evidence of the indebtedness of the drawer of the check, but also of the indebtedness of another party. See *Russell vs. Hankey*, 6 *T. R.*, 13.

If a bill is surrendered and a check taken for the amount, the want of power to recover against the endorsers is the result of the fact that the original holder of the bill is no longer able to produce it at the trial of any suit brought against such endorsers.

In this case it appears that Josiah Lee & Co. marked the bill of Hoffman & Co., left with them by the runner of the Merchants' Bank, as *cancelled.* No circumstance, except the payment of a bill, or some fact equivalent to its payment, authorizes such cancellation. If it is cancelled, when such facts and circumstances do not actually exist, the cancellation has taken place by the act of the party responsible upon the bill, without the assent of the rightful holder, and the act of cancellation is a simple nullity.

2 *Parsons on Bills,* 164 and 564. *Raper vs. Birkbeck,* 15 *East.,* 17. *Olcott vs. Rathbone,* 5 *Wend.,* 490. *Pratt vs. Foote,* 12 *Barb.,* 209.

A bank check is itself an inland bill of exchange payable on demand, and the general law is that if such an instrument is given to a party in the morning of any day, the holder makes the presentation of it in time, if he makes it at the bank, on which it is drawn, on the following morning. *Appleton vs. Sweetapple,* 3 *Doug.,* 137. 26 *Eng. C. L. Rep.,* 59. *Williams vs. Smith,* 2 *Barn. & Ald.,* 496. *Robson vs. Bennett,* 2 *Taunt.,* 388. *Chitty on Bills, Am. Ed.* 1842, 382 and 386. 2 *Parsons on Bills,* 72 and 73, and notes. *Byles on Bills,* 14.

Therefore, under the general "law merchant," the appellant in this case, *if authorized to receive a check at all for the bill,* had until the next day to present such check for payment. And, unless the Record clearly shows the existence among the banks in Baltimore of a usage to the contrary, the Merchants' Bank would have been authorized in retaining the check of Josiah Lee & Co. until the morning of the next banking day after the 30th of October, 1860. 2 *Parsons on Bills,* 72. *Moule vs. Brown,* 4 *Bing. N. C.,* 266, (33 *Eng. C. L. Rep.,* 348.) *Bayley on Bills, Eng. Ed.* 1830, 242. *Chitty on Bills,* 382. *O'Brien vs. Smith,* 1 *Black,* 99.

It was not material whether Holtzman, the runner, arrived at the Mechanics' Bank on the 30th of October, 1860, a little before, or a little after three o'clock, when he presented to that bank the check of Josiah Lee & Co. for payment. Nor is it material whether the outer door of the bank was closed or not when the runner arrived to make presentment of the check. For the Record shows that the teller of the Mechanics' Bank and its cashier were in the bank at the time, able to return an answer, and that they did return an answer by refusing to pay the check. The pre-

sentment for payment was therefore sufficiently made on that day. *Garnett vs. Woodcock*, 1 *Stark*, 475. 6 *M. & S.*, 44. *Chitty on Bills*, 387.

Where the drawer of a check has no effects in the hands of a drawee, the giving of such a check is a fraud in itself. *Bickerdike vs. Bollman*, 1 *T. R.*, 408. *Eichelberger vs. Finley*, 7 *H. & J.*, 386, 387, 388. 2 *Parsons on Bills*, 71, note E.

It is clear, from the cases cited above, and from the case of *Eichelberger vs. Finley*, 7 *H. & J.*, especially, that if the giving of the check by Lee & Co. upon the Mechanics' Bank to the Merchants' Bank was a fraud, the transaction did not change the right of any of the parties to demand the bill of exchange, for which the fraudulent check was professedly given. No presentment of that check within a reasonable time, or at any time, was necessary, nor when demand was made and payment refused, was the drawer of the check, so circumstanced, entitled to any notice. *Eichelberger vs. Finley*, 7 *H. & J.*, 387.

The first observation to be made in regard to the Court's instruction is, that the Court below was in error in the use of the following language in the instruction: "That the defendant, as such correspondent, received, and undertook and assumed to collect the same on the morning of the 30th of October, 1860." The instruction, as thus worded, was likely to mislead the jury, because it manifestly bears the construction that there was evidence in the cause, or a legal obligation existing on the part of the Merchants' Bank, sufficient to show an assumption by the Merchants' Bank of a duty to collect the bill on the morning of the 30th of October, 1860, and that it had been placed in the hands of the runner of the bank "*for that purpose.*" As the hour at which the amount of the bill ought to have been actually collected by the Merchants' Bank, on the 30th of October, 1860, forms the material basis of the

appellee's theory in this case, the language of the Court, so doubtfully worded as to leave the impression upon the minds of the jury that there was evidence in the cause that the Merchants' Bank had ·assumed to collect the bill on the *morning* of the 30th of October, 1860, and had placed it in the runner's hands *for that purpose,* is liable to grave objection.

It seems also plain that the Court below erred in permitting the jury to find the naked fact, that Josiah Lee & Co. were, about one o'clock in the afternoon of the 30th of October, 1860, "*in doubtful credit*," without, at the same time, requiring the jury to find that the Merchants' Bank knew that. such a state of doubtful credit existed. It is submitted to the Court that although evidence of general reputation is admissible to prove matters of public and general interest, and that all persons concerned in such questions are liable to be affected by such evidence of general reputation, yet, that the particular credit of a particular man, or firm, is not the subject of such evidence of general reputation, so as to affect the rights of a stranger. Men are not legally bound to know the commercial standing of each other.

It is further urged that the Court below gave an instruction tending to mislead the jury, when it left. to the jury as a material fact, the finding that Josiah Lee & Co. had marked the bill left with them by Holtzman as *cancelled.* The cancellation of the bill by Josiah Lee & Co. could only have been authorized upon the theory that the bill was in law, or in fact, paid by the operation of the particular circumstances which had taken place.   If they were mistaken as to the payment of the bill handed to them by Holtzman, their act of cancellation was a simple nullity. *Raper vs. Birkbeck*, 15 *East.*, 17.   Why then did the Court below leave the fact of the cancellation of the bill by Josiah Lee & Co. to the jury at all, without, also, requiring the

jury to find that the act of cancellation was authorized by the Merchants' Bank? Or, why did the Court below submit the question of the *cancellation* of the bill to the jury at all? The real matter for the jury to determine, under proper instructions, was not whether Josiah Lee & Co. had *cancelled* the bill drawn upon them, but it was whether the delivery of the check to the runner of the Merchants' Bank, and the leaving of the bill with Josiah Lee & Co. operated as a payment of the bill. The cancellation of the bill by Josiah Lee & Co. could avail to prove only, that Josiah Lee & Co. *thought* they had paid it, when they gave the check in question.

The Court below also erred when it made the near proximity of the Mechanics' Bank to the banking house of Josiah Lee & Co. one of the facts from which a conclusion of negligence on the part of the Merchants' Bank might properly be drawn. For, as the evidence in the case, to which the Court itself refers, shows that the house of Josiah Lee & Co. gave the check about *one o'clock*, and that the check would have been paid if it had been presented at any time before *two o'clock*, what reason was there for calling the attention of the jury to the relative distance between the banking house of Josiah Lee & Co. and the Mechanics' Bank, and between the banking house of Josiah Lee & Co. and the Merchants' Bank. The hour of time within which the terms of the instruction *concede* the check to have been absolutely good, was sufficient for a return to the Merchants' Bank and a subsequent demand by the runner for the payment of the check at the Mechanics' Bank. This being the case it was surely no evidence of negligence that the runner of the Merchants' Bank should have gone to that bank before going to the Mechanics' Bank.

It is further urged, that the Court erred when it left to the jury to find whether the check was presented for payment to the Mechanics' Bank a few minutes before three

o'clock, or a few minutes after three o'clock, as one element in the conduct of the Merchants' Bank, which was material to the case ; because, for the reasons already given, we insist that due diligence was used in presenting the check, if the presentation took place before three o'clock ; and that due diligence was equally used, if the presentment was made a few minutes after three o'clock, since both the cashier and the teller were at their posts in the Mechanics' Bank, ready to give an answer, and answering, when the check was actually presented.

It is further urged, that the Court also erred when it left the jury to find, as an additional fact, that there was on the 30th of October, 1860, "a usage among the banks of the city of Baltimore, as between them and their correspondents abroad, to get checks received for sight bills of exchange, when said checks were drawn by houses or individuals of doubtful credit, paid or endorsed good before taking them back to the banks holding them for collection."

All the evidence in this cause shows very clearly that the runner of the appellant, and the appellant itself, was authorized by the unvarying usage in Baltimore in receiving the check. Now we insist that in order to charge the appellant with any other duty as to this check than that imposed by the general rule of law to which we have referred, it was essential to the appellee to have shown an established and uniform custom among the banks in Baltimore, in relation to this particular matter of the time for presenting checks received for sight drafts. If a usage makes a part of the obligation of a party, it is only "when it is so far established, and so far known to the parties, that it must be supposed that their contract was made in reference to it. For this purpose the custom must be established and not casual, uniform and not varying, general and not personal, and known to the parties." 2

*Parsons on Contracts*, 53. *Wood vs. Wood*, 1 *C. & P.* 59. *The Paragon, Ware*, 322. *Trott vs. Wood*, 1 *Gall.* 444. *Martin vs. Delaware Insurance Co.* 2 *Wash., C. C. R.* 254. *Bank of Columbia vs. Fitzhugh*, 1 *H. & G.*, 248. *Foley & Woodside vs. Mason*, 6 *Md. Rep.*, 50.

Under these circumstances, since the evidence in this case was conflicting, and the practice of the appellant was shown to have been clearly different from the custom stated in the instruction of the Court, there was in reality no proper evidence of such a custom to be left to the jury. If a usage, as that term is known to the law, exists only when it is "the rule of all the banks of the place," is it not perfectly clear that there is no evidence, which ought to be left to the jury in relation to such usage, when the proof is, that such usage was not the rule of all the banks of the place, but that on the contrary no three banks were fully agreed as to what the usage was upon the subject.

The Court of Appeals will perceive that the Court below, in all that part of the instruction which we have considered, follows substantially the language of the prayers of the appellee, and that the instruction, thus far, submits to the jury the particular facts which they are to find, and concludes with the direction that if such facts are so found, the plaintiff (now appellee) is entitled to recover.

Is it not clear that the Court up to this point in the instruction, held that diligence was a question of law for the Court, and that the province of the jury was only to pass upon the particular facts, which the Court had set forth in the instruction as constituting want of diligence? Could there exist a clearer manifestation of the opinion of the Court that if the jury found the facts submitted to them, the negligence of the appellant was a conclusion of law drawn by the Court? The question of *diligence* is not submitted to the *jury* at all by the instruction, as far as we have here considered it, but the subject is left to the

jury as a mixed question of law and fact, the Court authorizing the jury to find the facts and instructing it as to the law applicable to such facts.

But what is the effect of the proviso appended to the instruction of the Court? The preceding part of the prayer recited the particular acts and omissions which the Court directed the jury would entitle the appellee to recover, if the jury found such acts and omissions to have occurred. And the Court by deciding that such acts and omissions on the part of the appellant entitled the appellee to recover, of course decided that such acts and omissions constituted in law and as a conclusion of law, a want of due diligence. When, therefore, in the proviso, the Court say further, that the plaintiff is not entitled to recover, unless the jury shall also find that the appellant in failing to have the check presented for payment or endorsed as good by the Mechanics' Bank before three o'clock on the 30th October, 1860, was guilty of a want of due care, it abandoned all the ground of the former part of the instruction and submitted the question of diligence to the jury as a question of fact.

But the proviso is not liable to this objection only. The Court, if it intended to leave the question of diligence to the jury, ought to have left it to be found by the jury upon all the evidence in the cause, and was not authorized to submit to the jury, as a circumstance upon which their opinion might be based, the fact whether there had been a failure to present the check to the Mechanics' Bank for endorsement as good, or for payment before three o'clock. Because it is quite clear that a presentment after three o'clock was in time if there was a person at the Mechanics' Bank when the presentment was made with sufficient authority to return an answer, and such person refused to pay the check. *Garnett vs. Woodcock*, 1 *Stark. R.*, 475. 6 *M. & S.*, 44.

Nor was the proviso consistent with itself in another particular. While the Court instructed the jury that the appellee was entitled to recover, if the jury found that the Merchants' Bank had been guilty of a want of due diligence in not presenting the check before three o'clock on the 30th of October, 1860, the Court also requires the jury to find as a fact essential to the appellee's right of recovery, that the check would have been paid if presented between one and three o'clock at the Mechanics' Bank.

Now, the only conclusion to be drawn from the first part of this proviso is, that the appellant had at least until three o'clock for the presentation of the check at the Mechanics' Bank, irrespective of the fact whether that check was good up to such hour or not. Why then was the jury also required to find that the check would have been paid by the Mechanics' Bank if it had been presented between one and two o'clock of that day? If the jury was authorized to find the Merchants' Bank guilty of negligence in failing to have the check presented before three o'clock, the Court must of necessity be understood as deciding that a presentment before three o'clock left no case of negligence for the jury. And it then would be certainly immaterial, if there was no evidence of negligence for the jury, whether the check would have been paid between one and two o'clock or not.

It is not proposed to discuss here at any great length the vexed question whether diligence is a question of law, or a question of fact, or a mixed question of law and fact. It is at all events not a question open to dispute in this State. If the evidence in a cause is not doubtful or contradictory, due diligence is a question of law for the Court. If the evidence is doubtful or contradictory, the facts must be left to the jury and the jury be directed that such and such facts, if found by the jury, constitute in law due diligence, or constitute in law the want of due diligence. But in every case, whether the facts be disputed or undis-

puted, the question whether such facts when ascertained amount to due diligence, or the want of it, is a question of law to be decided by the Court. If the facts are not disputed then the Court settles the whole question. If the facts are disputed the jury must ascertain the facts, and the Court then determines whether such facts constitute due diligence, or a want of due diligence. That this is the law in Maryland sufficiently appears from *Patten & Jones vs. Wilmot*, 1 *H. & J.*, 477. *Penn., Del. and Md. Steam Nav. Co. vs. Hungerford*, 6 *G. & J.*, 291. *Bell vs. Hagerstown Bank*, 7 *Gill*, 233. *Sasscer vs. Farmers' Bank*, 4 *Md. Rep.*, 409. *Ewalt & Myers vs. Harden & Hopkins*, 16 *Md. Rep.*, 169, 170.

The only other points which we shall discuss in this case are raised by the third, fourth, fifth and sixth prayers of the appellant, which were rejected by the Court below, and the law of which was stated directly otherwise by the practical meaning of the instruction given by the Court.

In any form which the pleadings in this case on the part of the appellee might have assumed, it is clear that the foundation of *a right to sue*, on the part of the appellee, ought to have been a legal ownership in the fund appropriated by the draft of Hoffman & Co. on Josiah Lee & Co., not only at the time of the supposed damage, but also at the time of bringing the suit against the appellant. 1 *Ch. P.*, 2, 46. *Hollins vs. Barney*, 3 *H. & J.*, 437. It is not a suit brought *upon the bill* drawn by Hoffman & Co., and, therefore, the general rules authorizing the *holder* of such paper to bring suit in the name of such holder cannot be appealed to in any way to sustain the right of the Bank of Commerce to sue in this case. It is a suit brought upon the theory that *because of the negligent dealing of the appellant with the bill in question*, in contravention to an express or implied agreement, the *fund* assigned by such bill of exchange was

lost. Now, if such a case of negligent dealing existed, who is the proper person to sue? There can be but one answer. It ought to be the person who was agreed with, and who has suffered damage by such negligent dealings, and to whom the fund thus negligently dealt with belonged at the time. Every other person, except such wrong-doer and such sufferer, was a stranger to the case.

If the appellant was guilty of negligence in its dealing as agent of the Bank of Commerce,—*and that question was properly presented in the instruction of the Superior Court,*—had the Bank of Commerce no right of suit whatever by reason of such negligence, even though it did experience no actual pecuniary loss? If we concede, for the sake of the argument, that it had in such case a right of suit, we are surely authorized to assert, that under such circumstances it could only recover *nominal damages.* Where the plaintiff gives no evidence of his loss the damage must be nominal. *Mayne on Damages,* 92 *Law Lib.*, 27, *m. p.* 3. *Sedgwick on Measure of Damages,* 47. *Dyer vs. Dorsey,* 1 *G. & J.*, 443. In this case no evidence of loss to the plaintiff was given or could be given.

The true law of the case, however, would seem to be that stated in the fourth prayer of the appellant, which recognizes the principle that the Bank of Commerce, by collecting its purchase money from Hoffman & Co., the drawers of the bill, condoned all its claims, and became thenceforth a stranger in interest. *Mayne on Damages,* 92 *Law Lib.*, 111. It cannot be doubted that if the Bank of Commerce had appeared as plaintiff in this action, without any intermingling of Hoffman & Co. in the cause, the proof of the fact that the Bank of Commerce had been repaid its purchase money in full, and had parted with all interest in the fund, would have left that bank with no other claim than to nominal damages, if to so much even.

The entry of the suit to the use of Hoffman & Co. cannot

change the law of the case.   There was never any contract or privity of contract between Hoffman & Co. and the appellant.

If they had not a right of action in themselves, the entry of the suit to their use no more enlarged the ground of claim, which *the Bank of Commerce* was authorized to make in this suit beyond *nominal* damages, than if the entry had been to the use of one who had never had lot or part in the whole transaction.

The Court of Appeals, however, cannot fail to perceive that the whole instruction of the Court below is founded upon the theory that the Bank of Commerce (although the sale under which it claimed title to the fund assigned by the bill of Hoffman & Co. had been rescinded, and the purchased money returned,) might claim damages precisely to the same extent as if the sale of such bill had never been rescinded, and the purchase money never had been repaid.

It is clear that the appellant was not the agent of Hoffman & Co., but of the Bank of Commerce, for the bill in question was *sold* to the Bank of Commerce before the agency of the appellant commenced.   If the bill could have been collected, *except for the neglect of the appellant, the chosen agent of the Bank of Commerce*, it is perfectly clear that the Bank of Commerce had no right of action whatever, and no claim whatever against Hoffman & Co. for recovery of the purchase money paid for the bill, or against Hoffman & Co., as drawers of the bill in question.   1 *Parsons on Bills*, 355.

If Hoffman & Co. could have proved any such negligence as is asserted to be the foundation of the claims of the appellee in this case, they could, after repayment of the money to the Bank of Commerce, have recovered it back from that bank as money paid under a mistake of facts. 1 *Parsons on Bills*, 246.   And the Bank of Commerce would

then, after such money had been received from it, *for the first time,* have been authorized to sue the appellant, if it had neglected its duty. *It was essential to Hoffman & Co. (having refunded the purchase money of the draft) that this course should have been taken, even if negligence had been proved against the appellant.* The mere neglect of Hoffman & Co. to inform themselves as to their liability to the Bank of Commerce, before payment of the protested bill, cannot change the legal course of procedure, which ought to have been resorted to. They cannot, to avoid circuity of action, practically sue parties with whom they had no privity whatever.

The 4th prayer of the appellant was based upon the following propositions, which it was error in the Superior Court to have denied.

1. That the appellant could not be charged with want of due diligence without showing actual loss to the appellee, and that the facts in the case showed that no such loss had occurred.

2. That when the bill was returned to the Bank of Commerce and paid by the drawers it ceased to have any legal existence, unless the payment was actually annulled and the parties reinstated in the position which they occupied before such payment. *Byles on Bills, Am. Ed.,* 1853, 132, *N.* 1. *Ballard vs. Greenbush,* 24 *Me.,* 336. *Callow vs. Lawrence,* 3 *M. & S.,* 95. *Bartrum vs. Caddy,* 36 *Eng. C. L. Rep.,* 138. *Martin vs. Mechanics' Bank,* 6 *H. & J.,* 244. 2 *Parsons on Bills,* 216. *Burr vs. Smith,* 21 *Barb.,* 262.

3. That the appellee could have no right of action against the appellant before returning the draft to the appellant.

The first of these points has been sufficiently discussed in connection with other parts of the case, and the second is maintained by the authorities cited.

As to the third point, the theory of the appellee is that negligence of the appellant charged the appellant in the same manner as if the draft had been actually collected by the appellant. But since the appellee demanded and received payment of the draft from Hoffman & Co., which it was only authorized to do upon the theory that the appellant had used due diligence, it affirmed and ratified the action of the appellant, and cannot be permitted to sue the appellant because of such action until it disaffirms it. It could only disaffirm it by returning the money to Hoffman & Co., and by returning the draft to the appellant before suit brought.

*John H. Thomas,* for the appellee, argued.

1st. That the instructions required the jury to find *every fact* necessary in law to the plaintiff's right of recovery, and the judgment ought not to be reversed, even if some of the defendant's prayers were abstractly correct. *Mutual Safety Insurance Co. vs Cohen,* 3 *Gill,* 459, 481, 482. *Keener vs. Harrod,* 2 *Md. Rep.,* 74. *Coates & Glenn vs. Sangston,* 5 *Md. Rep.,* 133. *Key vs. Dent,* 6 *Md. Rep.,* 142, 150, 151. *Canby vs. Frick,* 8 *Md. Rep.,* 163 *and* 168. *Edelin vs. Sanders,* 8 *Md. Rep.,* 118, 132. *New York Life Insurance Co. vs. Flack,* 3 *Md. Rep.,* 341, 356. *Keech vs. Balto. & Wash. R. R. Co.,* 17 *Md. Rep.,* 47.

2nd. That if the instructions required the jury to find *more* facts than were necessary, the appellee on whom the burden was improperly imposed might have complained, but not the appellant who was benefited, not prejudiced thereby; and that the latter cannot urge as a ground for reversal any error by which it was not prejudiced. *Trieber vs. Knabe,* 12 *Md. Rep.,* 491, 497. *Mulliken vs. Boyce,* 1 *Gill,* 61, 65. *Chew vs. Beall,* 13 *Md. Rep.,* 349, 371. *Edelin vs. Sanders,* 8 *Md. Rep.,* 118, 132.

3rd. That although the presentation of a negotiable instrument within a prescribed time is sufficient to fix the responsibility of parties to it, without reference to other circumstances, it is not always sufficient, and was not in this case, to relieve the collecting agent from responsibility. The latter is bound to use such skill and diligence as prudence requires, and if loss result to his principal from the want of them is liable therefor, although he may have done all that was necessary to establish the legal liability of all the parties to the instrument. 3 *Kent's Com.*, 82. *Allen vs. Suydam*, 17 *Wend.*, 370, 372. *The Mechanics' Bank, vs. Merchants' Bank*, 6 *Metcalf*, 20, 21, 26, 30. 2 *Parsons on Notes and Bills*, 85. *Byles on Bills*, 14. *Boddington vs. Schlencker*, 4 *Barn. & Adol.*, 752, 756, 757, 758 *and* 759.

4th. That the question whether due diligence has been used or not is one for the Court, where some definite thing alone is required to be done, as in an action against a party to a negotiable instrument, the presentation of which at a given time does or does not, as an absolute matter of law, amount to proper diligence ; but where dependent on circumstances, as in this case, it is one for the jury, and was properly and fairly submitted to them. *Ewall vs. Harding*, 16 *Md. Rep.*, 160, 170. *Patton vs. Wilmot*, 1 *H. & J.*, 477. *Edwards vs. Balt. Fire Insurance Co.*, 3 *Gill*, 189. *Keech vs. Balto. & Wash. R. R. Co.*, 17 *Md. Rep.*, 47.

5th. That whether that question belonged properly to the Court or the jury there was no error of which the appellant can complain ; if to the Court the facts in the agreed statement, together with the facts proven, which were left to the jury, viz :—that Lee & Co. were in *doubtful credit* when the check was given, that it would have been paid on presentation at any time (as the proof shows) within two hours thereafter, or as the instruction puts it, more unfavorably for the appellee, to two o'clock, that the runner of the appellant, although within the same square

as the bank on which it was drawn when he received it, kept it from one till a few minutes before or after three o'clock, when it had become worthless—would have compelled the Court to conclude that proper diligence had not been used, and the appellant was benefited by the Court's leaving that question to the jury and requiring them to find any additional fact, instead of itself determining the whole question in favor of the appellee ; if within the province of the jury, the proviso submitted it to them, and the above mentioned facts, which they were required to find as essential to the plaintiff's right of recovery, were abundantly sufficient. The appellant's chances were improved by requiring them to find other facts, whether there was proof of them or not, and such other facts being immaterial, the appellant cannot complain, even if they were assumed by the Court or submitted to the jury without proof, which, however, the appellee will contend was not done. *Mulliken vs. Boyce,* 1 *Gill,* 60 *and* 65. *Mayor and City Council of Balto. vs. Norman,* 4 *Md. Rep.,* 352, 360, *Edelin vs. Sanders,* 8 *Md. Rep.,* 118, 132.

6th. The check being equivalent to money when received, the appellant having so treated it and credited the appellee with the draft as if actually paid in cash, the latter was entitled to recover, as for *money had and received* ; every other fact was unimportant, and it is immaterial whether it was assumed by the Court or submitted to the jury without proof or not. See agreement as to the right to rely on any claim the facts may justify. *Balt. & Susq. R. R. Co. vs. Founce,* 6 *Gill,* 81. *Shanks vs. Dent,* 8 *Gill,* 120, 123. 12 *Barb., N. Y.,* 212.

7th. No fact was, however, assumed by the Court or submitted to the jury without proof. The witnesses, almost without exception, prove an uniform usage, requiring collecting banks to have checks drawn by persons of *doubtful credit* presented by the runner *at once* for payment or en-

dorsement before returning to his own bank. The proof is equally full that Lee & Co. were in *bad credit* when the check was drawn. Hopkins, the President of the appellant, as early as ten o'clock that morning, knew the condition of the house and was endeavoring to raise money to prevent them from failing. The runner did not ordinarily start on his rounds before twelve o'clock, and had almost every day drafts on that house amounting to four or five thousand dollars. Mr. Hopkins had ample time to warn the runner. There is no hardship in charging the bank under such circumstances with the obligation to know what was known to so many, including its own chief officer. Most of the witnesses proved that the usage required *all* checks, whether drawn by persons in good or bad credit, to be presented by the runner *at once before returning to his own bank,* and that a runner who failed to comply with such usage did so at the risk of his own bank, and that as between the latter and its correspondent the check was under such circumstances by the usage a payment of the draft. The appellant was bound to conform to the usage of other banks, and did in fact do so by crediting the appellee with the amount of the draft. In requiring the jury to find that Lee & Co. were in *doubtful credit,* and ignoring the proof which rendered the appellant responsible for the retention of the check, without reference to their credit or sufficiency, the question was submitted in the way most onerous to the appellee, and most favorable to the appellant. *Bell vs. Hagerstown Bank,* 7 *Gill,* 227. *Chapman vs. Walton,* 10 *Bing.,* 57. *Story on Agency,* § 199. *Grant on Banking,* 93 *Law Lib.,* 70.

8th. It makes no difference whether the bill was a sight draft or not. It did not differ from one in any respect affecting this case. If it were otherwise the parties have called it a sight draft in their agreement. The appellant has referred to it as such in all its prayers. It cannot now

deny, as matter of fact, that it was one, nor question the correctness of the designation so agreed to any more than it could the propriety of an instruction granted by consent. The agreed statement calls it a sight draft, but admits that Lee & Co. were bound to pay it on presentation. *Baugher vs. Wilkins,* 16 *Md. Rep.,* 35 *and* 46. *Swatara R. R. Co. vs. Brune,* 6 *Gill,* 48. *McColgan vs. Hopkins,* 17 *Md. Rep.,* 402.

9th. Technical objections that the Court assumed facts or submitted them to the jury without proof are no longer grounds for reversal. 1862, ch. 154, p. 176. *Calvert vs. Williams,* 10 *Md. Rep.,* 478, 486, 495. *Prout vs. Berry,* 2 *Gill,* 147 *and* 150. *Baugher vs. Nelson,* 9 *Gill,* 302, *Gover vs. Hall,* 3 *H. & J.,* 50.

10th. Hoffman & Co. might have recovered from the appellee the amount paid by them on the bill of exchange without knowledge of the facts, and would have instituted a suit for that purpose but for this mode of testing the liability of the appellant in the Courts of its own State, which was preferred by the latter. Such liability of the appellee was sufficient ground for action. 1 *Parsons on Bills,* 286. *Chew vs. Taylor,* 4 *H. & J.,* 54, 61. *Capron vs. Adams,* 21 *Md. Rep.,* 186.

11th. Courts will not inquire whether the legal plaintiff sues for himself or as trustee for another. The fact that his claim has been paid by the party to whose use the suit is entered does not affect his right to recover from the defendant. *Whiteford vs. Burkmeyer,* 1 *Gill,* 145. *Merryman vs. State,* 5 *H. & J.,* 423, 426 *and* 427. *Ellicott vs. Martin,* 6 *Md. Rep.,* 509, 516. *Whiting vs. Independent Mutual Insurance Company,* 15 *Md. Rep.,* 298, 313, 314, 315 *and* 316.

12th. Even if some of the appellant's prayers were abstractly right, if calculated to mislead the jury in their application to the case, they were properly rejected. *Clement vs. Small,* 9 *Gill,* 160.

13th. The appellant's prayers were all properly rejected because, as heretofore shown, the whole law was covered by the Court's instructions, and even such prayers as may have been abstractly right were only calculated to mislead and embarrass the jury. They were, besides, all liable to special objections.

The first, second and seventh leave out of view the question at whose risk checks for sight drafts were, under the practice, taken ; the evidence that it was the duty of the runner to present the check *at once* before returning to his own bank for payment or endorsement ; that as between the appellant and appellee, the receipt and retention of it were a payment of the draft ; and all the facts going to show that the appellant had not used the diligence and skill required of it by law as a collecting agent, and that it had actually treated the check as payment of the draft by passing $3,000 on its books to the credit of the appellee. The third and sixth are merely abstract. There was no attempt to charge the appellant as agent of any one else than the appellee or hold it responsible to any one else, nor to enlarge the measure of damages against it by entering the suit to anybody else's use, and the granting of these prayers would have only embarrassed and misled the jury, and they were properly refused for the reasons assigned under the 1st and 12th points.

The fourth asserts an erroneous principle. In an action against an agent for not collecting a negotiable instrument, it is not necessary to show that the principal has suffered actual damage. Failure to collect the money, and proof that it might have been collected, will entitle the principal to recover the amount of the instrument from his agent. *Sedgwick on Measure of Damages,* 339. *Decker vs. Matthews,* 5 *Sand.,* 439. *Same case,* 2 *Kernan,* (*N. Y. Sup. Ct. Rep.,*) 313.

That prayer and the fifth were also properly rejected,

4      v. 24

for the additional reasons assigned under the 1st, 10th and 11th points.

The seventh is liable to the objections already assigned, and to the further one that it refers only to the reason the runner may have had to doubt the credit of Josiah Lee & Co., and the fact that their failure created surprise with intelligent bankers and business men. The proof is that although *some* business men were surprised at the failure of that house, the community generally knew that they were in very bad credit, and it will be contended that a bank, undertaking to discharge a duty which requires a knowledge of people's credit, is bound to employ an agent possessed of necessary information so easily acquired.

14th. The instructions required the jury to find that the check was received before ten o'clock; that if it had been presented before two it would have been paid, but that it was not presented until a few minutes before or after three. This and the other facts left to the jury, were sufficient to entitle the plaintiff to recover, and the Court ought so to have instructed. Even if the proviso be considered as assuming that it was presented a few minutes after three, instead of a few minutes before, it was an immaterial fact. The proviso required the plaintiff to satisfy the jury of more than was necessary. The appellee might have complained of that, but not the appellant, as the latter was benefited by it. *Edelen vs. Sanders,* 8 *Md. Rep.,* 32. *Trieber vs. Knabe,* 12 *Md. Rep.,* 496, 497. *Mulliken vs. Boyce,* 1 *Gill,* 65. *Preston vs. Lightly,* 6 *Md. Rep.,* 98. *Coates & Glenn vs. Sangston,* 5 *Md. Rep.,* 121. *Canby vs. Frick,* 8 *Md. Rep.,* 168.

15th. No exception was taken to the proof of usage. The fact of the testimony having been taken subject to exceptions, does not entitle the appellant to object to it, without a prayer asking it to be excluded. *Coates & Glenn vs. Sangston,* 5 *Md. Rep.,* 127.

16th. The practice of other banks, even if not uniform, and not binding as usage, was proper to show how other agents in similar business discharged such duties, and thus to show what would have been proper diligence on the part of the appellant. *Story on Agency,* sec. 186. *Canby vs. Flack,* 8 *Md. Rep.,* 168.

17th. The instruction given means that the *assumption* and *undertaking* to collect the draft were on the morning of the 30th ; not that the thing was to be done on that day. Even if susceptible of a different interpretation, the proof as to the practice of other banks shows that such was the appellant's duty; and what the appellant did is certainly evidence of what it assumed and undertook to do.

18th. The appellant's undertaking was to collect the draft ; not merely to preserve the liability of the parties to it. The appellant does not show a discharge of this duty by showing that his negligence did not release any of the parties to the draft; as between them and the holders, the draft might and ought to have been collected, and the liability of Lee & Co., even if preserved, became worthless while the check, which the appellant ought to have collected, was in its hands.

COCHRAN, J., delivered the opinion of this Court.

The question as to the right of action, raised by the appellant's 3d, 4th, 5th and 6th prayers, is the first to be considered.

The substantial proposition of these prayers is, that the appellant was relieved from liability for negligence in failing to collect the draft on Lee & Co., by the subsequent payment of it by Hoffman & Co., notwithstanding their liability upon it as drawers was extinguished by that negligence, and their payment made under a mistake of fact that legally entitles them to a return of the money. The

effect of this payment on the appellee's right of action is, therefore, the real matter to be considered. The theory of the appellant in regard to it appears to us to be founded, in some measure, upon a misapprehension of the principles applicable to that state of case. Treating the payment, according to the hypothesis of these prayers, as one made by mistake, it certainly was one that conferred no benefit on the appellee, and we think it equally clear that it could not operate for the advantage of the appellant in the way of discharging, or suspending its antecedent liability to the appellee. As the amount of the draft was paid by Hoffman & Co., under a mistake that entitles them to a return of the money, the appellee must be regarded as having received it for their use, and as holding it subject to their order. In legal contemplation the payment was a deposit, for which the appellee must account, and which, instead of suspending or discharging the appellants from their existing liability to the appellee, charges the appellee with one of an entirely different character to Hoffman & Co. This in our opinion was the only legal effect of that transaction, and there is no reason for supposing that it changed or affected, in the slightest degree, any right or liability growing out of, or founded upon the previous relations of the parties here. The cases of *Merryman vs. State*, 5 *H. & J.*, 423, and *Whitney vs. Ind. Mut. Ins. Co.*, 15 *Md. Rep.*, 298, bear upon this question and tend to support the conclusion we have reached.

Nor was it essential to the appellee's right of action, that the jury should find that the draft was returned to the appellant. The claim asserted here, is not upon the draft, but one sounding in damages for the loss caused by the appellant's negligence and consequent failure to collect it ; the appellant did not undertake for the payment of the draft, but to exercise due care and diligence in collecting it, an undertaking wholly different in its nature from that

of any insurer, surety or party to the draft, and one that renders the production and return of the draft unnecessary to the appellee's right to recover.

But this is not all ; the case proceeded on the theory that the draft was rendered valueless by the appellant's misconduct in regard to it, and if there was evidence from which that fact could be, or was found, there is no reason for supposing that the appellant was prejudiced by the appellee's failure to surrender it. We think these prayers were properly rejected.

A review of the objections, made to the instructions given by the Court in lieu of all the prayers offered on both sides, will dispose of the remaining questions presented by the bill of exceptions. These objections are founded mainly on two grounds, 1st, that the instruction treats the question of diligence as one of fact for determination by the jury ; and 2d, that it submits that question to the jury on a hypothesis of fact, in some particulars calculated to mislead them, and in others not authorized by the evidence.

A careful examination of the case made by the proof has satisfied us that these objections cannot prevail. It is true beyond doubt that in cases of this character, a Court may, by proper legal inferences from the nature of the undertaking, determine in general the things required to be done in performing it, and that the failure to do any of the things, so required to be done, would amount to negligence ; but it has no such power when the question as to due diligence is made to depend on a state of facts and circumstances of a character so unusual that they could not have been contemplated by the parties to the undertaking, and to which no settled rule of law can be applied. The principle for testing the force of this objection, is, we think, correctly stated in the case of *Balt. & Ohio R. R. Co. vs. Worthington*, 21 *Md. Rep.*, 275. It was there said, a majority of the Court concurring, "that negligence in

the ordinary legal sense imports an absence or want of such care as the law requires in the performance of any given undertaking, and generally speaking is a fact, the finding of which is for the jury, although the Court may declare the legal nature and extent of the duties incident to the undertaking, as well as those facts which by inference of law are essential to its performance;" and again that the Court may determine the question in cases "where the negligence alleged may be deduced from the absence of any fact which the law of the contract presupposes, and requires should be shown." The question here did not depend on evidence of any omission on the part of the appellant to do those things which, by the settled rules of law, applicable to the undertaking, were necessary to its performance, but upon the proof of facts and circumstances that might have added to or changed the conditions of the duty to be performed, but in that respect of a character too uncertain to authorize a judicial determination of their effect. We think the question was properly submitted as one within the province of the jury.

The material point of the remaining objection is that the instruction submitted the question as to the "doubtful credit" of Lee & Co., to the jury as a fact bearing on the question of due care and diligence, without requiring them to find that the appellant had knowledge of it at the time of presenting the draft and receiving the check. We do not understand the words "doubtful credit" in the restricted sense contended for by the appellant. These terms are very comprehensive, and when used, as here, without words of limitation or qualification, are understood to mean reputation or standing in the community, as distinguished from the estimate of particular individuals. In that sense, the "doubtful credit" of Lee & Co., when found, was a fact of which the appellant presumptively had knowledge, and for that reason it was not necessary that such

knowledge should be otherwise ascertained. The other facts submitted to the jury, were all of them such as they could properly consider in passing on the question of negligence. There was evidence from which all of them could be found, and so far as we can discover, none of them were calculated to mislead the jury in finding their verdict. The ambiguity complained of by the appellant appears, upon reading the whole instruction, to be entirely removed, and we think, upon a full consideration of the whole case, that the judgment should be affirmed.

*Judgment affirmed.*

(Decided February 19th, 1866.)